UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

THERESE KAPINGA,                    )
                                    )
            Plaintiff               )
                                    )
v.                                  )          No. 2:22-cv-00322-JAW
                                    )
TERRACE POND, LLC, et al.,          )
                                    )
            Defendants              )

RECOMMENDED DECISION ON MOTIONS
TO DISMISS AND TO AMEND COMPLAINT

The Defendants, Terrace Pond, LLC, and Pizzo's Property Management, Inc.,
move to dismiss the portion of Count I of former tenant Therese Kapinga's six-count
complaint against them claiming violation of the Maine Civil Rights Act, 5 M.R.S.
§ 4684-A, the portion of Count II claiming retaliation in violation of 5 M.R.S.
§ 4633(1), and Counts III (hostile housing environment), IV (negligence),
V (intentional infliction of emotional distress (IIED)), and VI (negligent infliction of
emotional distress (NIED)) in their entirety. *See* Motion to Dismiss (MTD) (ECF No.
4) at 1.

Kapinga does not contest the dismissal of portions of Counts I and II of her
complaint or Count VI in its entirety. *See* MTD Opposition (ECF No. 9) at 3-8.
However, she opposes the dismissal of Counts III, IV, and V, *see id.*, and
simultaneously moves to amend her complaint to "clarify and narrow the factual
content," "clarify the specific conduct of each Defendant," remove the claims whose
dismissal she does not contest, and add two new claims, for violation of Maine's

1

Unfair Trade Practices Act (UTPA) and respondeat superior, s*ee* Motion to Amend (MTA) (ECF No. 8) at 1.  The Defendants oppose the motion to amend on the bases that it is futile and that "the Court should proceed to decide the pending motion to dismiss the initial complaint."  MTA Opposition (ECF No. 11) at 1.  However, they request that, if the Court elects "to decide all applicable 12(b)(6) issues on the basis of one complaint and one set of briefing and, accordingly, grants the motion for leave to file a first amended complaint without addressing any failure-to-state-a-claim issues," the Court permit them to file a new motion to dismiss pursuant to Rule 12(b)(6).  *See id*. at 1-2.  Kapinga filed no reply to the MTA Opposition.

For the sake of efficiency, I address both the motion to dismiss and the motion to amend, including the Defendants' arguments that the two proposed new claims are futile.  I recommend that the Court (1) grant the motion to dismiss in part, as to the portion of Count I claiming violation of the Maine Civil Rights Act, 5 M.R.S. § 4684-A, the portion of Count II claiming retaliation in violation of 5 M.R.S. § 4633(1), Count IV (negligence), and Count VI (NIED), and otherwise deny it, and (2) grant the motion to amend to the extent that Kapinga seeks to revise factual content, incorporate her concessions, and add a UTPA claim predicated on failures to renew her lease or return her security deposit, and otherwise deny it.  I further recommend that the Court order Kapinga to file a revised proposed first amended complaint consistent with the Court's ruling within fourteen days of its issuance.[1]

---

[1] Should the Court agree with my recommended disposition of both motions, the following claims will remain:  Count I (unlawful housing discrimination in violation of 5 M.R.S. §§ 4581-4583, the Maine Fair Housing Act, and the Federal Fair Housing Act and Fair Housing Amendments Act, 42 U.S.C.

## I.   Factual Background[2]

Kapinga was born in the Democratic Republic of Congo, emigrated to the United States, and resides in Portland, Maine.  Complaint (ECF No. 1) ¶ 8; Proposed First Amended Complaint ("Proposed FAC") (ECF No. 8-1) ¶ 10.  On December 23, 2020, she signed a lease for an apartment at Terrace Pond Apartments. Complaint ¶ 9; Proposed FAC ¶ 11.  The Defendants were made aware of Kapinga's Congolese national original by her rental application, her accent, and her appearance. Complaint ¶ 10; Proposed FAC ¶ 12.  Kapinga moved into the apartment on January 1, 2021, and lived there until December 31, 2021, when her lease expired and was not renewed.  Complaint ¶ 11; Proposed FAC ¶ 13.

Beginning in August 2021, Kapinga began seeing cockroaches in her unit and attempted to kill them using household insecticides.  Complaint ¶ 12; Proposed FAC ¶ 14.  She also discarded food, clothing, and personal items and experienced sleep issues, restlessness, and other symptoms of emotional distress as a result.  Proposed FAC ¶ 14.  On September 9, 2021, she submitted a maintenance request to the Defendants to alert them of the cockroach problem and ask that they call a professional exterminator.  Complaint ¶ 13; Proposed FAC ¶ 15.  Other tenants were experiencing cockroach infestations but failed to report them to building management.  Complaint ¶ 14; Proposed FAC ¶ 16. On September 13, 2021, Waltham

§§ 3601-3619, 3631), Count II (hostile housing environment in violation of 5 M.R.S. §§ 4581-4583, the Maine Fair Housing Act, and the Federal Fair Housing Act and Fair Housing Amendments Act (42 U.S.C. §§ 3601-3619, 3631), Count III (IIED), and Count IV (violation of Maine's Unfair Trade Practices Act, 5 M.R.S. §§ 205-A et seq.), to the extent predicated on failures to renew Kapinga's lease or return her security deposit.

[2] There is no material difference between the facts alleged in the operative complaint and those alleged in the proposed amended complaint.  Hence, I have cited both versions.

Pest inspected and treated Kapinga's apartment, but the Defendants failed to have them inspect or treat any other areas of the building. Complaint ¶ 15; Proposed FAC ¶ 17. The Defendants' failure to fully inspect and treat the entire building worsened the infestation in Kapinga's apartment, requiring additional treatments of her apartment on September 22, September 27, October 6, and November 4. Complaint ¶ 16; Proposed FAC ¶ 18.

On September 22, 2021, Waltham Pest recommended inspecting the units above Kapinga's apartment to search for the source of the infestation because the treatment of her apartment was ineffective. Complaint ¶ 17; Proposed FAC ¶ 19. On that day, two other units on Kapinga's floor were also treated for cockroaches. *Id.* The laundry room next to Kapinga's apartment was not treated until October 6, at which point her apartment had shown drastic improvement while the other units were still infested. Complaint ¶ 18; Proposed FAC ¶ 20.

On or about September 22, 2021, the Defendants accused Kapinga of being the source of the cockroach infestation based solely on conjecture, stereotyping, and bigotry attributable to her Congolese national origin, habits, and lifestyle. Complaint ¶ 19; Proposed FAC ¶ 21. In point of fact, Kapinga was not the source of the infestation; other units were also infested. Complaint ¶ 22; Proposed FAC ¶ 24. Solely because of their prejudice against Kapinga's Congolese national origin, which they blamed for the cockroach infestation, the Defendants sought to evict her from her apartment, and, after that action terminated in her favor, refused to renew her lease and wrongfully withheld her security deposit after she vacated her apartment,

which they falsely claimed she had damaged.  Complaint ¶¶ 20-23; Proposed FAC ¶¶ 22-24.

As a result of the Defendants' actions, Kapinga suffered economic damages, including the loss of personal items, the costs of medical treatment and a more expensive apartment, and severe emotional distress manifesting in physical symptoms for which she required medical attention.  Complaint ¶ 25; Proposed FAC ¶ 27.

## II.  Motion to Dismiss

### A.  Legal Standard

A court reviewing a motion to dismiss for failure to state a claim must "accept as true all well-pleaded facts alleged in the complaint and draw all reasonable inferences therefrom in the pleader's favor." *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 52-53 (1st Cir. 2013) (quoting *Santiago v. Puerto Rico*, 655 F.3d 61, 72 (1st Cir. 2011)). To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint "must contain sufficient factual matter to state a claim to relief that is plausible on its face." *Id.* at 53 (quoting *Grajales v. P.R. Ports Auth.*, 682 F.3d 40, 44 (1st Cir. 2012)).

To assess the complaint's adequacy, courts apply a "two-pronged approach," *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011): First, the court must "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements," and, second, the court will take the complaint's well-pleaded "(i.e., non-conclusory, non-speculative)

facts as true, drawing all reasonable inferences in the pleader's favor, and see if they plausibly narrate a claim for relief," *Schatz v. Republican State Leadership Comm.*, 669 F.3d 50, 55 (1st Cir. 2012).

## B. Discussion

### 1. Hostile Housing Environment (Count III)[3]

For purposes of the motion to dismiss, both sides assume that the First Circuit and the Law Court would recognize hostile housing environment causes of action under the federal Fair Housing Act and the Maine Human Rights Act, as have other courts. *See* MTD at 6-7; MTD Opposition at 3.

The Seventh Circuit, borrowing the analytical framework applied to Title VII hostile work environment claims, has held:

> A hostile-housing-environment claim requires a plaintiff to show that: (1) she endured unwelcome harassment based on a protected characteristic; (2) the harassment was severe or pervasive enough to interfere with the terms, conditions, or privileges of her residency, or in the provision of services or facilities; and (3) that there is a basis for imputing liability to the defendant.

*Wetzel v. Glen St. Andrew Living Cmty., LLC*, 901 F.3d 856, 861-62 (7th Cir. 2018).

The Seventh Circuit "recognize[d], however, that there are some potentially important differences between the relationship that exists between an employer and an employee, in which one is the agent of the other, and that between a landlord and a tenant, in which the tenant is largely independent of the landlord." *Id.* at 863. One such difference, the Department of Housing and Urban Development (HUD) has noted, is that because "[o]ne's home is a place of privacy, security, and refuge (or

---

[3] This claim is set forth in Count II of the proposed amended complaint. *See* Proposed FAC ¶¶ 36-42.

should be), . . . harassment that occurs in or around one's home can be far more intrusive, violative and threatening than harassment in the more public environment of one's work place."   Quid Pro Quo and Hostile Environment Harassment and Liability for Discriminatory Housing Practices under the Fair Housing Act, 81 Fed. Reg. 63,054, 63,055 (Sept. 14, 2016) (footnote omitted).

The Defendants seek dismissal of Count III on the basis that the Complaint is devoid of well-pleaded factual allegations of harassment sufficiently severe or pervasive to constitute a hostile housing environment.   *See* Motion to Dismiss at 8-10.   They assert that, apart from conclusory allegations, Kapinga relies on only one incident to buttress her hostile housing environment claim—that on or about September 22, 2021, the Defendants allegedly accused her of being the source of the cockroach infestation based on her Congolese national origin.   *See id.* at 9.   They contend that this lone incident is insufficient to meet the "severe and pervasive" element and thus fails as a matter of law to constitute a hostile housing environment. *See id.* at 9-10.

I disagree.   The accusation that Kapinga was the source of the cockroach infestation is not the sole conduct alleged by Kapinga.   More particularly, Kapinga alleges that *because* the Defendants falsely accused her of being the source of the infestation based on her national origin, they failed to adequately treat the infestation, worsening it, sought to evict her, refused to renew her lease, and wrongfully withheld her security deposit.   As Kapinga argues, and I agree, this alleged conduct qualifies as "harassment . . . severe and pervasive enough to interfere

7

with the privileges of her residency."  MTD Opposition at 5; *Lang v. SPM Prop. Mgmt.*, No. 1:19-cv-190-TFM-B, 2020 WL 13695197, at \*13 (S.D. Ala. Feb. 27, 2020) (holding that conduct alleged by tenants was "sufficiently severe and pervasive to alter the terms and conditions of [their] tenancy and create a discriminatorily abusive living environment" when their landlord "refused, on the basis of their race and disability, to take effectual action to abate excessive upstairs noise that interfered with [their] use and enjoyment of their unit, called the police on [them] for no valid reason, secretly recorded [their] living space, and threatened [them] with eviction for exercising their rights as leaseholders").

The Defendants, accordingly, fail to demonstrate their entitlement to the dismissal of Kapinga's hostile housing environment claim.

### 2.  Negligence (Count IV)[4]

Kapinga alleges in Count IV that the Defendants breached their duty to provide housing that was safe and free from pests when they failed to properly treat the cockroach infestation, causing her economic and emotional injury.  *See* Complaint ¶¶ 50-54; Proposed Amended FAC ¶¶ 44-47.  The Defendants seek to dismiss this count primarily on the basis that absent any allegation from which the Court could infer that Kapinga suffered physical injury or property damage, she fails to state a claim of negligence.  *See* MTD at 11-12.  I agree.

"The duty of reasonable care that applies in an action for general negligence is a duty to act reasonably to avoid causing *physical harm* to others."  *Boivin v. Somatex*,

---

[4] This claim is set forth in Count III of the proposed amended complaint.  *See* Proposed FAC ¶¶ 43-48.

*Inc.*, 2022 ME 44, ¶ 12, 279 A.3d 393 (cleaned up). "Liability in negligence, therefore, ordinarily requires proof of personal injury or property damage." *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 2010 ME 93, ¶ 9, 4 A.3d 492. With regard to personal injury, "physical harm" is defined as "the physical impairment of the human body ('bodily harm'), including physical injury, illness, disease, impairment of bodily function, and death." *Boivin*, 2022 ME 44, ¶ 12 n.3, 279 A.3d 393 (cleaned up).

Kapinga argues that she sufficiently pleads the existence of a duty because landlords in Maine have a statutory duty to maintain rental properties fit for human habitation. *See* MTD Opposition at 6 (citing 14 M.R.S.A. §§ 6021, 6026 (Westlaw)). Yet, the cited statutory provisions do not purport to expand the scope of landlords' duty for purposes of general negligence claims. On the contrary, Section 6021 creates an implied warranty of fitness for human habitation, *see* 14 M.R.S.A. § 6021(2), Section 6026 bars landlords from maintaining or permitting conditions endangering tenants' health and safety, *see* 14 M.R.S.A. § 6026(1), and both statutes prescribe mechanisms through which tenants may seek relief for violations of those duties, *see* 14 M.R.S.A. ¶¶ 6021(3)-(4), 6026(2).

Kapinga also asserts that because she alleges that she suffered severe emotional distress for which she received medical treatment, she "has alleged physical harm to her person . . . sufficient to survive a Motion to Dismiss." MTD Opposition at 6. However, the Court cannot reasonably infer from Kapinga's alleged receipt of unspecified medical treatment for emotional distress that she suffered "physical harm" as defined in *Boivin*.

Kapinga also alleges that she "suffered severe emotional distress which manifested in physical symptoms for which she required medical attention." Complaint ¶ 25; Proposed FAC ¶ 27. Yet, she neither describes those symptoms nor explains why *any* symptoms of emotional distress qualify as physical harm for purposes of the general negligence duty of care in Maine, a proposition that is not self-evident. In *Boivin*, the Law Court characterized a plaintiff's symptoms from post-traumatic stress disorder (PTSD)—frequent night terrors that left her "exhausted, confused, and unable to concentrate on daily personal tasks"—as emotional rather than physical harm, leaving open the question of whether "the effects of PTSD" could "ever qualify as a physical injury that would fall within the scope of the general negligence duty of care." *Boivin*, 2022 ME 44, ¶¶ 12-14, 279 A.3d 393. In the absence of any specification of her symptoms flowing from emotional distress or any argument why they qualify as "physical harm," Kapinga fails to state a claim of general negligence.

The Court, accordingly, should dismiss Count IV of the Complaint.

### 3. IIED Claim (Count V)[5]

To make out a claim that she has been subjected to the intentional infliction of emotional distress, a plaintiff must show that:

> (1)   the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from her conduct; (2) the conduct was so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community; (3)  the actions of the defendant caused the plaintiff's emotional distress;

---

[5] This claim is set forth in Count IV of the proposed amended complaint. *See* Proposed FAC ¶¶ 49-56.

> and (4) the emotional distress suffered by the plaintiff was so severe that no reasonable person could be expected to endure it.

*Argereow v. Weisberg*, 2018 ME 140, ¶ 27, 195 A.3d 1210 (cleaned up). "The determination of whether the facts alleged are sufficient to establish that the defendant's conduct is so extreme and outrageous to permit recovery is a question of law for the court to decide." *Id.* (cleaned up).

Kapinga alleges that the Defendants intentionally inflicted emotional distress when, based solely on conjecture, stereotyping, and bigotry attributable to her Congolese national origin, habits, and lifestyle, they falsely blamed her for the cockroach infestation, brought an unsuccessful action to evict her from her apartment, refused to renew her lease, and then wrongfully withheld her security deposit after she vacated her apartment, which they falsely claimed she had damaged. *See* Complaint ¶¶ 15-23, 56-58; Proposed FAC ¶¶ 17-25, 59-61.

The Defendants argue that, as a matter of law, this alleged conduct is not so extreme and outrageous as to exceed all possible bounds of decency and necessarily be regarded as atrocious and utterly intolerable in a civilized community. *See* MTD at 13-14 (citing *Bratton v. McDonough*, 2014 ME 64, 91 A.3d 1050). Kapinga contends that her allegations suffice to survive a motion to dismiss. *See* MTD Opposition at 7-8. The question is a close one; however, mindful that, "[w]here reasonable people may differ, it is for the jury to determine whether, in particular case, . . . conduct has been sufficiently extreme and outrageous to result in liability," *Bratton*, 2014 ME 64, ¶ 23, 91 A.3d 1050 (cleaned up), I recommend that the Court deny the Defendants' motion to dismiss the IIED claim.

In *Bratton*, the Law Court reversed the trial court's grant of a landlord's motion for judgment as a matter of law on tenants' IIED claim when the evidence, viewed in the light most favorable to the tenants, showed that the landlord had "allowed a family with young children to live in a house that exposed the children to toxic levels of lead for several years," and, "even after the house had been declared a lead hazard by the State and although [the landlord] had a legal duty to relocate the Brattons, he failed to do so for four months." *Bratton*, 2014 ME 64, ¶ 23, 91 A.3d 1050.

The Defendants argue that, by contrast, their alleged conduct of (1) blaming Kapinga for a cockroach infestation (even though they "acted immediately to try to kill the cockroaches and willingly commissioned multiple treatments of her unit"), (2) making hurtful and insensitive comments about her national origin, (3) attempting to evict her, and (4) then not renewing her lease was not, as a matter of law, "so extreme and outrageous so as to exceed all possible bounds of decency to be regarded as atrocious" and "utterly intolerable in a civilized community." MTD at 13.

Yet, viewing Kapinga's allegations in the light most favorable to her, the Defendants wrongly identified her as the source of a repulsive cockroach infestation based solely on her Congolese national origin, habits, and lifestyle and then launched a retaliatory campaign against her, bringing an unsuccessful action to evict her from her apartment, refusing to renew her lease, and then wrongfully withholding her security deposit after she vacated the premises.

A reasonable person could find such conduct, entailing abuse of a landlord's power over a tenant, discrimination based on the tenant's Congolese national origin, and the tenant's resulting loss of her home, atrocious and intolerable in a civilized society. *See Clark v. Means*, No. Civ.A. CV-01-170, 2004 WL 1463048, at *3 (Me. Super. Ct. May 19, 2004) (denying a supervisor's bid for summary judgment as to a former employee's IIED claim predicated on sexual harassment when, among other things, the supervisor "had a high level position within the company that employed [her], thus creating a disparity of power"); Restatement (Second) of Torts § 46 cmt. e (Am. L. Inst. 1965) (observing that "[t]he extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests"; for example, a landlord); *Taylor v. Metzger*, 706 A.2d 685, 696 (N.J. 1998) (holding that "[i]n light of the potency of racial slurs and defendant's authority as sheriff, a jury could reasonably determine that defendant's conduct was extreme and outrageous" when he "referred to plaintiff, who had been a sheriff's officer for twenty years, as a 'jungle bunny'" in the presence of the undersheriff).[6]

The Court, accordingly, should deny the motion to dismiss Count IV of the Complaint.

---

[6] In support of their motion to dismiss Kapinga's IIED claim, the Defendants also cite three landlord-tenant cases rejecting IIED claims, *Benyo v. Sikorjak*, 858 N.Y.S.2d 215, 218 (N.Y. App. Div. 2008), *Carey v. Edgewood Mgmt. Corp.*, 754 A.2d 951, 956 (D.C. 2000), and *Bown v. Hamilton*, 601 A.2d 1074, 1079 (D.C. 1992). *See* MTD at 14. All three are materially distinguishable in that they did not involve landlord conduct predicated on alleged animus against a tenant based on the tenant's race or national origin.

### III.  Motion to Amend

#### A.  Legal Standard

"A motion to amend . . . will be treated differently depending on its timing and the context in which it is filed." *See Steir v. Girls Scouts of the USA*, 383 F.3d 7, 11-12 (1st Cir. 2004).  In some circumstances, a party may amend its pleading as a matter of course; otherwise, as here, a party may amend its pleading only with the consent of the opposing party or leave of court.  *See* Fed. R. Civ. P. 15(a)(1)-(2).

When, as here, such leave is sought before the deadline for amendment of pleadings, it should be "freely" given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nevertheless, courts are not obligated to "mindlessly grant every request for leave to amend" and may deny leave "[w]hen the proffered amendment comes too late, would be an exercise in futility, or otherwise would serve no useful purpose." *Aponte-Torres v. Univ. of P.R.*, 445 F.3d 50, 58 (1st Cir. 2008).  In assessing futility, courts apply the same standard as when assessing motions to dismiss under Federal Rule of Civil Procedure 12(b)(6).  Thus, an amendment is futile when, even assuming the truth of all well-pleaded facts, it fails to state a claim upon which relief could be granted.  *See Glassman v. Computervision Corp.*, 90 F.3d 617, 623 (1st Cir. 1996).

#### B.  Discussion

##### 1.  Proposed UTPA Claim

Kapinga seeks to bring an unfair trade practices claim against the Defendants, alleging that (1) her lease was unclear as to what steps she should take upon discovery of a cockroach infestation, and she reasonably could have believed that she

14

was obligated to attempt to treat it herself prior to seeking the Defendants' assistance, (2) after she reported the problem to the Defendants, they wrongly blamed her for the infestation, which they then failed to properly treat and caused to spread, and (3) the Defendants retaliated against her based on her Congolese national origin by attempting to evict her and refusing to renew her lease. Proposed FAC ¶¶ 59-64. She asserts that this "retaliatory and discriminatory conduct in conjunction with this lease" constituted unfair and/or deceptive trade practices. *Id.* ¶ 65.

As a threshold matter, the Defendants argue that the proposed UTPA claim is futile because the Maine legislature defined the universe of unfair and deceptive trade practices by landlords in enacting 14 M.R.S.A. § 6030 (Westlaw). *See* MTA Opposition at 4. However, while Section 6030 defines certain landlord practices as violative of the UTPA, it does not purport to list all such practices, and the Defendants cite no caselaw construing it to do so. I therefore decline to construe it that broadly.

In the alternative, the Defendants assert, the proposed UTPA claim is futile because Kapinga fails to plead conduct that can be characterized as unfair or deceptive pursuant to the UTPA. *See* MTA Opposition at 6-7. That is true of some— but not all—of the alleged conduct.

"An act or practice is deceptive if it is a material representation, omission, act or practice that is likely to mislead consumers acting reasonably under the circumstances." *State v. Weinschenk*, 2005 ME 28, ¶ 17, 868 A.2d 200. "A material representation, omission, act or practice involves information that is important to consumers and, hence, likely to affect their choice of, or conduct regarding, a product."

15

*Id.* (cleaned up).  To qualify as "unfair," an act or practice "(1) must cause, or be likely to cause, substantial injury to consumers; (2) that is not reasonably avoidable by consumers; and (3) that is not outweighed by any countervailing benefits to consumers or competition."  *Id.* ¶ 16.

As the Defendants suggest, *see* MTA Opposition at 6-7, the Proposed FAC does not make clear which acts or practices Kapinga alleges are deceptive or unfair. Insofar as appears, the only "deceptive" practice of which she complains is that the lease did not spell out the steps a tenant should take to report a pest infestation.  Yet, Kapinga offers no basis to conclude that a lease's lack of clarity regarding the manner in which a tenant should report a pest infestation is sufficiently important to affect a prospective tenant's decision to sign a lease.

Kapinga also fails to state a claim that the Defendants engaged in "unfair" conduct in unsuccessfully attempting to evict her and wrongfully blaming her for the cockroach infestation, which they then failed to properly treat.  As the Defendants point out, *see id.* at 6-7, the "substantial injury" contemplated by the UTPA is a pecuniary one: a loss of money or property, *see, e.g., Thurston v. Progressive Cas. Ins. Co.*, No. 1:22-cv-00375-NT, 2023 WL 4083232, at \*8 (D. Me. June 20, 2023) ("The UTPA confers a private right of action to persons who 'suffer[ ] any loss of money or property, real or personal, as a result of' an unfair or deceptive practice") (quoting 5 M.R.S. § 213(1)).

The proposed first amended complaint identifies no loss of money or property attributable to the Defendants' unsuccessful attempt to evict Kapinga.  And, while

Kapinga does allege that in August 2021, after she "began seeing cockroaches in her unit" and "attempted to kill them using household insecticides," she "discarded food, clothing, and personal items" as a result of the infestation, Proposed FAC ¶ 14, she does not clarify whether, and if so to what extent, she lost items due to the Defendants' allegedly inadequate pest control efforts or any other retaliatory actions after she first reported the infestation on September 9, 2021. *See id*. ¶¶ 14-27.

I do find, however, that Kapinga has stated a UTPA claim with respect to the Defendants' alleged failure to renew her lease. The Defendants argue that, because Kapinga's lease ended on December 31, 2021, and she had no right to its renewal, "she was in the same position she would have been in" had the lease automatically terminated if neither side affirmatively renewed it. MTA Opposition at 7 & n.5. They add that, even if they renewed her lease, there is no guarantee that they would not have increased her rent. *See id*. at 7 n.5. Yet, Kapinga alleges that the Defendants wrongfully declined to renew her lease *because of* her Congolese national origin. *See* Proposed FAC ¶¶ 22, 24, 27. Accepting her version of events, as I must for purposes of this motion to dismiss, she would not have incurred the cost of renting a more expensive apartment absent the unfair trade practice of which she complains.

Moreover, Kapinga alleged that, as part of the Defendants' retaliatory campaign against her, they wrongfully withheld her security deposit after she moved out, falsely claiming that she had damaged her unit. *See* Proposed FAC ¶ 25. While she did not reiterate this allegation in setting forth her UTPA claim, she generally alleged that the Defendants "engaged in retaliatory and discriminatory conduct" that

constituted "unfair and/or deceptive trade practices," *id.* ¶ 65, and incorporated by reference all prior allegations of her Complaint, *see id.* ¶ 57.

Accordingly, Kapinga's request to amend her complaint to add a UTPA claim should be granted insofar as it rests on failures to renew her lease or return her security deposit.

### 2. Proposed Respondeat Superior Claim

Kapinga finally seeks to bring a claim of respondeat superior to hold the Defendants liable for "the actions and omissions of employees and third parties under their employ in relation to Terrace Pond Apartments." Proposed FAC ¶ 70. However, as the Defendants note, *see* MTA Opposition at 7-8, respondeat superior "merely connotes a doctrine of imputation once an underlying theory of liability has been established" and "is not a separate cause of action," *Frank v. L.L. Bean, Inc.*, 352 F. Supp. 2d 8, 14 (D. Me. 2005) (cleaned up).

As such, Kapinga's request for permission to amend her complaint to add a claim of respondeat superior should be denied as futile.

### IV. Conclusion

For the foregoing reasons, I recommend that the Court **GRANT** the motion to dismiss in part, as to the portion of Count I claiming violation of the Maine Civil Rights Act, 5 M.R.S. § 4684-A, the portion of Count II claiming retaliation in violation of 5 M.R.S. § 4633(1), Count IV (negligence), and Count VI (NIED), and otherwise **DENY** it, and **GRANT** the motion to amend to the extent that Kapinga seeks to revise factual content, incorporate her concessions, and add a UTPA claim predicated on

failures to renew her lease or return her security deposit, and otherwise **DENY** it.  I

further recommend that the Court **ORDER** Kapinga to file a revised proposed first

amended complaint consistent with the Court's ruling within fourteen days of its

issuance.

## *NOTICE*

*A party may file objections to those specified portions of a Magistrate Judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the District Court is sought, together with a supporting memorandum, within fourteen (14) days after being served with a copy thereof.  A responsive memorandum shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the District Court and to appeal the District Court's order.*

Dated: July 27, 2023

/s/ Karen Frink Wolf
United States Magistrate Judge
